# H. HOWARD HENZE *v.* STATE OF MARYLAND.
[No. 69, October Term, 1927.]

334

*Decided January 20th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Harry W. Nice* and *Lindsay C. Spencer,* with whom was *Max Sokol* on the brief, for the appellant.

*John Hubner Rice, Assistant Attorney General,* and *Hilary W. Gans, Deputy State's Attorney for Baltimore City,* with whom was *Thomas H. Robinson, Attorney General,* on the brief, for the State.

PATTISON, J., delivered the opinion of the Court.

The appellant, Howard Henze, was convicted in the Criminal Court of Baltimore City of the crime of receiving stolen money, the property of the Mercantile Bank. The indictment under which he was tried is in these words:

"The jurors of the State of Maryland, for the body of the City of Baltimore, do on their oath present that H. Howard Henze, late of the City of Baltimore aforesaid, on the fifteenth day of December in the year of our Lord nineteen hundred and twenty-four at the City of Baltimore aforesaid, one hundred thousand dollars current money of the value of one hundred thousand dollars current money, of the goods and chattels, moneys and properties of the Mercantile Bank, a corporation, then lately before feloniously stolen, taken,

and carried away, unlawfully did then and there have and receive, then and there well knowing the said goods and chattels, moneys and properties to have been feloniously stolen, taken and carried away, contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State."

The defendant demurred to the indictment on the ground that it fails to name either the alleged thief, or the person from whom the money alleged to have been stolen was received. This form of indictment has been used for many years in this state, and not until now has it ever been assailed, so far as we are informed.

It is contended by the appellant that the necessity for naming, in the indictment, the person from whom the stolen money was received, arises from an amendment to section 423, of article 27, of the Code of 1912, made by the Act of 1918, ch. 424, which provides that the receiver mentioned in said section may be prosecuted and punished, "although such receiver shall have received such money, goods or chattels or things from a person other than the person by whom such money, goods or chattels or things shall have been stolen."

It was said in *State v. Hodges*, 55 Md. 138, that "in this state the Code merely prescribes the punishment for receiving stolen goods and does not, in any manner, change the nature or character of the offense itself." It is true that this was said before the passage of the amendment referred to, but the amendment does not, we think, change the nature and character of the offense. There is, in our opinion, no new offense created by the amendment as claimed by the appellant. The offense still remains a common law offense, and it was only necessary to set out in the indictment the circumstances necessary to constitute the offense at common law. To state such offense it was not necessary to allege in the indictment the name of the thief or the person from whom the property was received.

In the trial of the case, twenty-four exceptions were taken to the rulings of the court upon the evidence. The defendant in his brief stated that he would discuss the exceptions in what he deemed the order of their importance, and we will follow the same order in passing upon them.

The ninth exception will be first considered. This exception was taken to the court's refusal to allow the defendant to put in evidence certain facts offered by him while Farrell was upon the stand on cross examination. Farrell was the person charged and convicted of having stolen the money which the appellant Henze is here charged with having received, knowing it to have been stolen.

Farrell testified that he was at the time serving a twelve year sentence in the Maryland Penitentiary for the larceny of the money of the Mercantile Bank of Baltimore City, that when he stole the money he was employed by that bank, where he had started about the year 1916 as a runner, but during the period in which the money was stolen, commencing in 1921, and ending in 1924, he was a clerk in the savings department of the bank. He first met Henze in the fall of 1921, when he was but seventeen years of age, was introduced to him by Kerr, the receiving teller of the bank. Henze at that time was a book-maker in the City of Baltimore. Shortly after the meeting, Henze gave Farrell his telephone number, also an identification number, which were thereafter used by Farrell in his betting with Henze. The first bet made by Farrell was in 1921. Until that time he had never bet upon the races, except a few times when at the races. His first bets with Henze were two dollars, probably twice a week, some for himself and some for Kerr. He then increased his bets to five, ten, twenty, and one hundred dollars. For about a year he kept a record of his winnings and losses.

When he began to bet, the bets were made with his own money, but after he got up to twenty dollars, the money belonged to the bank, and at the end of the first year he had lost $11,000 of the bank's money, which he had paid to

Henze from the savings department of the bank. Seven or eight months after starting to bet, he bet $500, which he lost. This bet was for Kerr, but it was not paid by Kerr, and he, Farrell, paid it out of the money of the bank. The money at times was paid to Henze in the bank, and at other times in the cigar store of John Naff, on the northeast corner of Carrollton Avenue and Baltimore Street. The money was left at the store with Henze, if he was there; if not, with Naff or Naff's father, in accordance with Henze's direction. When the money was paid to Henze in the bank, it was paid to him in the booth used by those having safe deposit boxes in the bank. After the first year of his betting, and after he had learned that he had taken $11,000 of the bank's money, his bets increased to more than $500, some as high as $2,500, and on one race he lost $5,000, and was unable to get this amount together when Henze called at eleven o'clock the next day, the hour at which he usually collected his money, and he told Henze to come back in the afternoon, at which time he paid him $5,000 of the bank's money. After that, in the early part of 1924, Henze required him to make a deposit of $2,000 with Naff at the latter's store. At the time Farrell was taking this money from the bank, he was receiving a salary of only $110.50 a month, which fact was known to Henze, to whom he gave over $100,000 of the bank's money within a period of about three years. In his testimony Farrell stated very fully the methods used by him in taking the money of the bank, without being detected either by the officials of the bank or by the auditor upon his semi-annual visits to the bank, but we do not deem it necessary to prolong this opinion by stating the methods employed by him, as it will serve no useful purpose. This closed the examination in chief, and the defendant proceeded with his cross-examination, when the witness was asked if the place of Flynn, a book maker of Baltimore City, was not raided in 1923, to which the State by its counsel objected. Whereupon the court and counsel, at the suggestion of the court, withdrew to its chambers, and there the court called upon the counsel for defendant to make an

offer of proof, which he did. The offer, in substance, was as follows:

It is the purpose of the defense in further cross-examination of the witness Farrell, and by other witnesses, to show that all of the bank officials, including the president, vice-president, cashier and board of directors, as well as the employees, knew that Farrell was betting on the races, not only with Henze, but with other book makers, and at various race tracks; that he had bet at Flynn's sums of money at various times, on races, in excess of $50, sometimes as much as $100; that Farrell had been arrested at Flynn's place in July, 1923, and that the fact of his arrest was known to the officials and employees of the bank; that Healy, the president of the bank, had questioned witness about the raid and that Farrell admitted to him that he had been betting on the races at Flynn's and other places; that Healy, a number of times thereafter, called Farrell to account for his betting on horse races; that Healy was told by Burns, the detective, that Farrell was betting on races, and, although the officials of the bank had such information, no investigation of his accounts was ever made; that racing sheets and racing forms and printed information concerning horse racing were at all times found in and around the bank, and this was known to the officials and employees of the bank; that Farrell placed bets for employees of the bank, including Dee, Johnson and Kerr, and that this fact was known to the officials of the bank, and further that the facts above stated were not only known to the officials of the bank, but Henze knew that such facts were known to them, and in addition thereto, that Farrell, in making his bets on horse races, would use the telephone which led through the telephone exchange or switchboard of the bank, and that these telephone conversations were audible to the clerks in the bank; that Farrell received long-distance telephone calls at Naff's store and from out of town, that Naff was ordered by him to pay his telephone and telegraph bill; that he subscribed for and had information concerning horse racing from out of town individuals sent to Naff's store; that Farrell visited various

tracks in and out of the state "at some of which he was accompanied by, or saw, not only officials, but employees of the bank," and that Henze knew of these facts; that Farrell "told people, including the employees of the bank, that he was betting on the races with money furnished him by a combination of friends and relatives, which information was not only in the possession of the defendant Henze, but many others"; that Farrell placed in an envelope, during the year 1923, $2,000, and left it in the custody of Naff, to be opened only in the presence of Naff, Henze and Farrell; "that on one occasion the witness (Farrell) not being able to meet his obligation to Henze at eleven o'clock in the morning, which obligation represented the loss of a bet made by him, the witness (Farrell), with Henze, on the preceding day, opened the envelope in the presence of Naff and Henze, and stated that the reason why he had been "unable to meet the obligation was that the people for whom he had been betting did not come to town."

At this point in the offer of proof, the court interrupted the counsel for defendant, and stated that it was prepared to rule on the matter upon the objection by counsel for the State, which objection was made by the State, and the court stated that the "offer of proof comprehended some matters which the court thinks are clearly admissible, namely: First, That portion having to do with the placing of the $2,000 on deposit with Naff; and the explanation given by the witness to the defendant Henze, as to the reason given for the using of a part of same. Second. Everything that the witness may testify to as to what he told Henze as to the source of the money which he was betting, and particularly his statements to Henze that some of said money came from employees and officials of the bank. Third. All evidence as to winnings made by the witness, Farrell." It then said: "The court is of the opinion, as to the remainder of the offer of proof, that the admission of such testimony can only have one effect, and that it is immaterial and irrelevant. Its only effect would be to confuse the minds of the jury and to make a fictitious issue in this case, namely, whether or not the officers of the

bank were themselves guilty of misconduct in the management of the bank's affairs. If the defendant will go a step further and offer to prove that the officials of the bank knew, or had reason to know, that Farrell, a clerk, employed at a salary of $110.50 a month, was placing bets with Henze, in amounts running sometimes as high as $5,000 a day, and that this knowledge did not cause such officials to make any inquiry as to the source of Farrell's money for the placing of said bets, then the court would be of the opinion that such evidence might tend to prove that Henze, the defendant, as a reasonable man, was not placed upon similar inquiry. In the absence of such additional offer, the court will sustain the objection to the line of proof thus far offered, with the exception of the items thereof specified at the beginning of these remarks."

Then it was suggested by counsel for the defense to include within the offer that the "officials of the bank had reason, from facts which were within their knowledge, as set worth in the above offer of proof, to know that the said witness, Farrell, was betting large sums of money on the races for a long period of time, and that the fact that the bank officials had such information was known to the defendant Henze." This was objected to by the State and the objection sustained by the court, upon the ground that the offer was too general. It was then suggested by counsel for the defendant that there be added to the offer the fact that the president and cashier of the bank "were aware of the witness' (Farrell's) betting on horse racing in varying amounts, as disclosed to them by Captain Burns, and from other sources, and felt it necessary to admonish the witness Farrell, on at least twelve occasions, against betting on the races, during the period of five years, all of said things being known to Henze." To this the court said, "Well, of course, that has already been ruled upon and refused," to which ruling the counsel for the defense noted an exception, and the court replied "Yes, exception noted to all adverse rulings."

The facts that the money was stolen, and that Henze received a part of it, are not disputed. The only disputed

question was whether Henze received the money knowing it to have been stolen.

In deciding that question, it was not necessary for the jury to find that such guilty knowledge was direct or actual. It was sufficient if circumstantial and inductive, and the receiver believed or reasonably suspected, from the circumstances of the transaction, that the money was stolen. 34 *Cyc.*, page 516.

The defendant contends that the evidence offered should have been admitted in order that the jury could have seen and understand the neutralizing effect of such evidence upon other facts within the knowledge of the defendant, which other facts, considered alone, might have been regarded by the jury as sufficient to cause him to believe that the money bet with him by Farrell was the money of the bank. It was contended by the defendant that if the officials of the bank knew of the facts contained in the offer, and the defendant knew that such officials were in possession of those facts, he could rightly assume that the officials had assured themselves, by investigation, that Farrell was not paying his losses from the money of the bank.

The court, in rejecting the evidence, took the position that the evidence offered, to be admissible, should have been co-extensive with the knowledge of the defendant, that is, to be admissible, it should have shown, not only that the bank officials know that Farrell was betting on the races, but that they knew the extent to which he was betting, as well as all other facts known to the defendant in relation to said betting. It might have been, had the officials of the bank known all the facts that were known to the defendant, including one of the most important facts, the extent of Farrell's losses, which was known to Henze, but not to the officials of the bank, they would have suspected Farrell of stealing the bank's money, and would have made an investigation of the affairs of the bank. Henze not only knew the full amount of Farrell's betting with him, as well as the amount of his losses occurring from time to time, which were not known to the officials of the bank, but he also knew many other things of which those officials had no knowledge, and it was not for him to assume

that Farrell was not using the funds of the bank in his betting, because of the general knowledge of the bank that he was betting, though not knowing the extent of his betting, nor the amount of his losses. But in addition thereto and as a further reason for its exclusion, this evidence, if admitted, as said by the learned court below, would have resulted in submitting to the jury a fictitious issue, whether or not the officials of the bank were themselves guilty of misconduct in the management of the bank's affairs. The admission of this evidence, we think, would have created that issue, an issue which had no proper place in the case, and one which would have had the tendency, at least, to withdraw the attention of the jury from the real issue, whether the defendant was guilty of the offence charged against him.

Assuming the officials of the bank were grossly negligent in performing their duties, and, as a result of that negligence, Farrell had less difficulty in stealing the money, which was not the money of the officials alone, but of the depositors and stockholders of the bank as well, and that such negligence enabled the defendant to receive the stolen money from Farrell, neither Farrell nor Henze would be excused or relieved of the consequence of the offence committed by him. Whether the defendant knew, or had reason to believe, that the money was stolen, depended upon the facts and circumstances known to him.

It will be observed that the court, in its refusal to admit in evidence the facts offered in the ninth exception, stated that if the defendant would go further in its offer and prove other facts stated by the court, then it "would be of the opinion that such evidence might tend to prove that Henze, the defendant, *as a reasonable man* was not placed upon similar inquiry." Several pages of the defendant's brief is taken up in criticism of the use by the court of the term "reasonable man," contending that the test to be applied was not whether Henze, *as a reasonable man,* knew or should have known that the money was stolen, but the test was, what Henze, the particular individual, would naturally have believed under the facts and circumstances of the case. Con-

ceding for sake of argument that the counsel for defendant correctly states the rule, the question under consideration would not be affected thereby, as the expression used by the court is not involved in this exception. The court was called upon to rule whether the facts offered were proper to be admitted in evidence and it ruled against their admissibility. What it thereafter said is in no wise involved in that ruling. It merely expressed an opinion as to the possible effect upon the admissibility of such facts in evidence, if offered in connection with other facts, but no offer containing such additional facts was ever made and no ruling had thereon. The objectionable term used, out of the presence of the jury, in no way prejudiced the rights of the defendant, even though it was an improper statement of the law.

The eighteenth and nineteenth exceptions were taken to the admission of the defendant's testimony given at a former trial, and the twentieth exception was to the refusal of the court to strike it out; while, the twenty-first and twenty-second exceptions were taken to the admission of testimony in contradiction of parts of the defendant's testimony so admitted.

The counsel for the defendant frankly admits that the numerical weight of authorities favor the admissibility of this evidence, but insists that the reasoning in *People v. McMahon,* 15 N. Y. 384, upon which case he chiefly, if not altogether, relies in support of its inadmissibility, is more forceful and cogent than that found in the cases in opposition to his contention.

In *People v. McMahon, supra,* testimony of the accused at a coroner's inquest was admitted over an objection that such testimony was not voluntary, and on appeal it was held that it should have been excluded because he was in actual custody as a suspected party and was examined under oath by the coroner while in such custody.

In the earlier case of *Hendrickson v. People,* 10 N. Y. 13, where the Supreme Court of New York admitted in evidence the testimony given by the defendant before the coroner, and where their action was sustained by the Court of Appeals

of that state, the defendant had been examined as a witness before the coroner who was conducting the inquiry into the cause of death, without any charge having been made against the prisoner, and when he had not been apprised that suspicion rested upon him, except so far as the interrogatories addressed to him were calculated to suggest that the death was caused by his agency.

These two cases were distinguished by the fact that in the earlier *Hendrickson* case, the defendant did not stand accused of the crime while, in the later case of *McMahon v. People,* the defendant stood accused of crime. These cases were followed later by the case of *Teachout v. People,* 41 N. Y. 9. In that case, quoting from the syllabus, it is said: "Statements made by the prisoner, under oath at a coroner's inquest, are admissible against him upon his trial for the murder, although he knew at the time he was sworn, that it was suspected the deceased was poisoned by him; that he himself would probably be arrested for the crime, and was informed by the coroner that he had a right to refuse to testify."

In *Teachout v. People, supra,* the learned judge said, "The exhaustive examination and discussion of authorities by court and counsel in *Hendrickson v. People,* 10 N. Y. 13, and *McMahon v. People,* 15 N. Y. 384, render it wholly unprofitable to go again through a review of the cases, in which the declarations of a person made under oath may be received, or must be rejected, when offered as evidence on his trial for a crime. In my judgment we ought to regard the decision in the former of those cases decisive of the present. It is quite true that the very able opinion of the learned judge (Selden) who alone appears to have discussed the later case, reiterates most distinctly the views expressed in his dissenting opinion in the former, but we are not warranted in inferring that the other judges intended to either overrule or weaken the effect of the former decision."

In the still later case of *People v. Molineux,* 168 N. Y. 264, it was held that the testimony of the accused as a witness at the inquest was admissible against him, although it appeared that he had been brought before the coroner by

subpoena, had not been advised of his rights, and had been threatened with contempt if he refused to testify. We have referred to these cases at some length because of the fact that the reasoning in *McMahon v. People, supra,* so much commended by the defendant's counsel in this case for its force and cogency, has not been followed in the subsequent cases in the same court.

In support of the admission of this evidence, it is said in 16 C. J. 569, par. 1106: "The constitutional right of defendant not to be compelled to be a witness against himself is not violated by the introduction in evidence of his testimony, voluntarily given on a former trial for the same offence," and again in the same work (page 630, par. 1251) it is said: "Statements made by accused in testifying voluntarily on a former trial of himself * * * are received against accused as his admissions." The author, in support of the rule or principles above stated, cites the cases of *State v. Simmons,* 78 Kan. 852; *Bess v. Commonwealth,* 118 Ky. 858; *Mackmasters v. State,* 83 Miss. 1; *Miller v. People,* 216 Ill. 309; and *State v. Kimes,* 152 Iowa, 240.

In the case of *State v. Simmons, supra,* the court said: "The defendant voluntarily took the witness stand in his own behalf and was cross-examined at the first trial. His evidence was written by a stenographer, and, after it was duly identified, was offered by the State in the second trial. The defendant by his counsel suggested to the court that the defendant was present, that under the provisions of the constitution he could not be compelled to give evidence against himself, and that the reading of his testimony would be equivalent to compelling him to testify. The defendant was not requested again to take the witness stand, but his objection to the reading of his former testimony was overruled." The court then said, quoting from 1 *Thompson on Trials,* sec. 647: "If the accused waives his privilege and takes the witness stand in his own behalf at any stage of the prosecution, he waives it for every subsequent stage."

In *Bess v. Commonwealth, supra,* it was said: "A defendant cannot be made to give evidence against himself. A fail-

ure to testify for himself cannot be commented on or used against him on his trial. When he does become a witness for himself, he occupies the position of any other witness introduced on the trial. To prove on the last trial what he said voluntarily in giving his evidence on the former trial is not making him give evidence against himself, nor is it commenting upon his failure to testify for himself. To admit such evidence is not violative of the constitution, which protects one from being forced to give evidence against himself, nor of the law which protects him from being prejudiced by having failed to testify for himself. Neither the organic nor statutory law was intended to relieve the accused of the incriminating effect of voluntary statements which he may have made out of court, or in court, when he voluntarily went upon the witness stand in his own behalf.

In *Mackmasters v. State, supra,* it was said: "It is well settled law in this state that, where a defendant chooses to take the witness stand and testify in his own behalf, in any court, his statement upon that occasion can be used against him upon any future trial of the cause * * *. Where the statute makes an accused person a competent witness in his own behalf, and he testifies in the exercise of his right, this testimony may afterwards be used against him * * *. This rule, so repeatedly approved by our court, is the true rule. Where a defendant who is by statute granted the privilege of testifying in his own behalf, or, if he so chooses, of remaining silent, in which event the district attorney is forbidden to comment on the fact of his silence, deliberately decides to assume the character of a witness, he assumes all the incidents of that position. No wrong was done the defendant by using his own statement of the details of the transaction delivered by him under the sanctity of an oath."

In *Miller v. People, supra,* the defendant had testified in his own behalf at a former trial, and the court there said: "He elected to exercise a right which the law gave him, to testify in his own behalf; and in so doing he became as other ordinary witnesses, save that it was proper for the jury to consider that he was the defendant, and was being tried for

the crime charged. The statements or admissions made by him when so testifying were in no wise privileged, but might lawfully be proven upon another trial for consideration in determining his guilt or innocence."

The admissibility of the evidence given at a former trial depends upon the question whether or not it was voluntary. To be admissible it must be voluntary, and where there is no evidence to the contrary, it will be presumed that the evidence so given was voluntary. The defendant at the former trial went upon the stand of his own volition, and the evidence there given is, we think, admissible in this case.

The twenty-first, twenty-second, twenty-third, and twenty-fourth exceptions were to the rulings of the court in allowing the State witnesses Johnson and Dee to contradict Henze in certain statements made by him in his evidence. The State did not make the defendant its own witness by repeating to the jury his own story, as told upon a former trial, and the fact that some portions of the statement so read were thereafter contradicted by the State's witnesses cannot be regarded as a violation of the rule which forbids a party to impeach its own witnesses. *Mackmaster v. State, supra.* If the evidence was admissible, as we have held it to be, it would seem right and proper that the State should have been allowed to contradict any exculpatory statements made by the defendant in his evidence; consequently we do not see any error committed by the court in its rulings upon these exceptions.

The first, second, third, fourth, fifth, sixth, fourteenth, and fifteenth exceptions were to the rulings of the court in admitting evidence as to the payment, the place of payment, and the facts and circumstances of the payment, of the money by Farrell to Henze upon the bets made by Farrell. The fact that the stolen money was received by Henze from Farrell was an essential element of the crime with which Henze was charged, and a fact necessary to be proved in order to obtain a conviction, and evidence as to the place where, and the facts and circumstances under

which, the money was received by Henze, was admissible as reflecting upon the further question, whether Henze knew or had reason to believe that the money received by him was stolen.

The seventh exception was to the ruling of the court in permitting the witness Farrell to answer the question, "Did you win or lose most of the time?" and the eighth exception to the refusal of the court to strike out the answer thereto. We fail to discover any error in the court's rulings on these exceptions.

The thirteenth and sixteenth exceptions were to the rulings of the court in not permitting Shaffer and Byerly to testify that they had heard Farrell say he was betting for a combination of friends and relatives. This evidence, we think, was properly excluded, for, if he had told these parties that he was betting for friends and relatives, it would in no way reflect upon the issue, where it was not shown that such statements were communicated to Henze, for, unless they were so communicated, they could not in any way have affected or influenced Henze. But, in any event, as Farrell had already testified that he had said to Henze that he was betting for friends and relatives, the defendant could not have been injured thereby. Consequently, we find no error in the court's rulings on these exceptions.

Nor do we find any reversible error in the twelfth exception, where Farrell was asked if he visited Pimlico after he stopped betting with Henze. The evidence sought by this question was immaterial and irrelevant, and was properly excluded.

The judgment, from what we have said, will be affirmed.

*Judgment affirmed, with costs.*

PARKE, J., dissents.