## ADAMS *v.* STATE

[No. 147, October Term, 1952.]

*Decided June 10, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.

*G. C. A. Anderson* and *Hilary W. Gans,* with whom were *Joseph H. A. Rogan* and *J. Francis Ford,* on the brief, for appellant.

*Ambrose T. Hartman,* Assistant Attorney General, with whom were *Edward D. E. Rollins,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City, *W. H. Maynard* and *William C. Rogers, Jr.,* Assistant State's Attorneys, on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This is the appeal of William Adams from his conviction by the Criminal Court of Baltimore on an indictment charging that he and Walter Rouse, of Baltimore, on August 1, 1947, and thence continually until August 15, 1951, unlawfully conspired together, and with certain other persons to the jurors unknown, to violate the lottery laws of the State of Maryland. The Court, acting upon the motion of Rouse, ordered a severance. Adams was then tried by the Court sitting without a jury. He was found guilty and was sentenced to the Maryland Penitentiary for a term of seven years and to pay a fine of $2,000.

It appears that the State failed to produce any evidence that appellant had conspired with anyone by the name of Rouse, but showed that appellant had conspired with Reuben Maurice Jones and other persons. Jones, the chief witness for the State, was one of the participants in a numbers business conducted on Calhoun Street from November, 1947, until March, 1948. He testified that on November 1, 1947, appellant phoned him that if he would call to see Milton Foster, he could get a job in that business that would pay him a commission of 25 per cent of the profits. Jones called at Foster's home on November 2 and started to work on November 3. He kept the accounts of eight men who were "getting

the numbers business out in the street," and after each day's work he took the money to his home. Whenever he accumulated about a thousand dollars, he would take it to the Adams Realty Company on Pennsylvania Avenue, where appellant had his private office. He testified that at one time the pile of cash in the safe at the Adams Realty Company amounted to $29,000. However, on March 20, 1948, according to his testimony, he quittted the business. He recalled that he walked into appellant's private office, threw the books on the table and said to him: "I am through with this job. There is not any future in it whatsoever."

Jones further testified that one day in October, 1949, while playing golf in Carroll Park, he was talking with appellant about the gambling business. He testified: "I was kidding him about numbers 500 and 501 hit just before Labor Day." He further testified that appellant told him that he could get a job in a new numbers business, whereupon he replied: "I feel that numbers you are paying too much, 7 to 1. * * * I felt it should have been 6 to 1, if he was going to operate. In that way you would have more plush or margin on which to sustain those big numbers when you hit like 500 or 501."

Jones finally testified that in June, 1950, he attended two meetings held in the office of the Adams Realty Company to consider starting a new numbers business. At those meetings he declared that he would not work in any numbers business unless it paid him a commission of 25 per cent of the profits and the numbers paid only 6 to 1, as "that was the only way anybody in Baltimore is going to really make money out of the numbers business.

The clear inference can be drawn from these conversations between appellant and Jones that appellant was still unlawfully conspiring as late as June, 1950.

One of the early rules of the common law was that the name of a person necessary for complete description of a crime should be stated in the indictment, if the name of such person is known. The obvious reason for

this rule is that every person indicted for a crime is entitled to be informed of the nature of the charge as precisely as possible to enable him to properly prepare his defense. *State v. Rappise,* 3 N. J. Super. 30, 65 A. 2d 266. However, in order to prevent a failure of justice, it is now generally accepted that if the name of a person necessary for complete description of a crime is unknown to the grand jurors, they are justified in alleging that the name of such person is unknown to them.

It is preferable that an indictment for conspiracy should state the names of the co-conspirators. Code (1951), art. 27, sec. 48; *Hurwitz v. State,* 200 Md. 578, 92 A. 2d 575. It frequently happens, however, as the Court said in *Rosenthal v. United States,* 8 Cir., 45 F. 2d 1000, 1003, 78 A. L. R. 1415, that an indictment charges the defendant with a conspiracy with persons unknown, even though it is not contemplated that the unknown persons will ever be prosecuted.

Of course, in order to convict on an indictment charging a conspiracy, the evidence must establish the conspiracy charged and not some other conspiracy. *Dowdy v. United States,* 4 Cir., 46 F. 2d 417; *Lefco v. United States,* 3 Cir., 74 F. 2d 66. But where an indictment alleges that two defendants conspired with other persons to the grand jury unknown, one of the defendants may be convicted, even though the other was not a party to the conspiracy, if the proof shows that some other person unknown to the grand jury was a party to it. *Worthington v. United States,* 7 Cir., 64 F. 2d 936, 939.

In the case at bar the chief witness, Reuben Maurice Jones, was known to the grand jurors, because he appeared as one of the witnesses before them. Nevertheless, his testimony showed that appellant conspired to violate the lottery laws not only with him but also with other persons who were presumably unknown to the grand jurors.

Appellant contended that the prosecution was barred by the Statute of Limitations. Prosecution for the crime

of conspiracy must be commenced in Maryland within two years after the commission of the offense. Code 1951, art. 27, sec. 46; *Scarlett v. State*, 201 Md. 310, 93 A. 2d 753. The indictment in this case was filed on August 24, 1951. Appellant argues that Jones got out of the numbers business on Calhoun Street in March, 1948, and that his testimony as to his conversation with appellant in October, 1949, and as to the meetings held in the office of the Adams Realty Company in June, 1950, to consider starting a new numbers business was not substantial enough to prove that he conspired to violate the lottery laws after March, 1948.

If there were any doubt on this contention, it was removed by the introduction in evidence of the testimony which appellant gave before the United States Senate Crime Investigating Committee in Washington. He testified before that Committee that he did not give up the numbers business until May, 1950. He admitted that he had about ten men who brought in the money, and that he had a bookkeeper who assisted him with the records.

Appellant strongly objected to the introduction of the confession which he made before the Senate Committee. He argued that since he was subpoenaed to appear before that Committee, and since he could have been charged with a misdemeanor if he failed to appear, his confession was given under compulsion.

The Bill of Rights, the first ten amendments of the Federal Constitution, contains guaranties against oppressive proceedings in Federal criminal prosecutions. The Fifth Amendment provides the Anglo-American concept of justice that no person shall be compelled in any criminal case to be a witness against himself. Likewise, Article 22 of the Maryland Declaration of Rights declares: "That no man ought to be compelled to give evidence against himself in a criminal case."

In *Henze v. State*, 154 Md. 332, 347, 140 A. 218, the Court of Appeals held that the right of an accused person not to be compelled to give evidence against

himself, as guaranteed by the Maryland Declaration of Rights, is not violated by the introduction in evidence of a confession which he voluntarily gave at a former trial for the same offense. The admissibility of testimony given at a former trial depends upon whether or not it was voluntary. To be admissible it must be voluntary, and where there is no evidence to the contrary it will be presumed that the testimony was voluntary.

Appellant cited the Act of Congress providing that every person who, having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House or any committee of either House, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, is guilty of a misdemeanor. 2 U. S. C. A. sec. 192.

Appellant also relied on the Act of Congress which provides that no testimony given by a witness before either House, or before any Committee of either House, or before any Joint Committee shall be used as evidence in any criminal proceeding against him in any Court, except in a prosecution for perjury committed in giving such testimony. 18 U. S. C. A. sec. 3486.

However, we accept the decision, as announced by the Court of Appeals of the District of Columbia in *May v. United States,* 84 U. S. App. D. C. 233, 175 F. 2d 994, 1000, 1001, *certiorari* denied, 338 U. S. 830, 70 S. Ct. 58, 94 L. Ed. 505, that in the absence of a refusal to answer followed by compulsion to answer, no immunity from prosecution arising out of the subject matter of testimony inures to the benefit of a witness before Congress either (1) under the Fifth Amendment of the Federal Constitution, or (2) under the statute penalizing failure to testify before Congress, or (3) under the statute providing that no testimony given before Congress shall be used as evidence in any criminal proceeding.

In explaining that decision Justice Prettyman, speaking for the Court, said:

"The Fifth Amendment deals with compulsion to testify against oneself. Experience long ago demonstrated that public authorities must at times, in the public interest, obtain information which might incriminate the informant. They may compel that testimony. But they cannot violate, qualify or limit the Constitution. Therefore, when they compel testimony, they cannot use it against the informant. The Constitution is rigid in this respect.

"But not all testimony given public authorities is compelled. Some is given voluntarily, and some, even though not volunteered, is supplied without objection. The Constitution says nothing about such testimony. It does not provide that what a man says voluntarily may not be used against him. So a statute which deals generally with the use of testimony falls partly within and partly without the scope of the Amendment. In so far as it relates to the use of involuntary testimony, it cannot impinge upon the prohibition of the Amendment. In so far as it relates to the use of other testimony, it is outside the scope of the Amendment and unaffected by it. The Constitution does not require that a statute dealing generally, but exclusively, with the use of testimony be construed to prevent prosecution upon the subject matter of the testimony."

In this case appellant had testified before the Senate Committee without any claim of immunity from self-incrimination. We understand that he refused to answer one question, not material here, and one of the Senators made the comment that the Committee did not have the power to compel an answer to that question. But the testimony of appellant which was introduced in the Court below was given before the Committee voluntarily. The constitutional privilege against the giving of incriminating testimony must be asserted before an im-

munity is established. To be liable to the penalties of the statute requiring testimony before Congress, a witness must be asked a question and he must refuse to answer. As the Senate Committee did not compel appellant to testify, no immunity arose. Consequently his testimony was admissible in evidence at his trial. The Court did not do him any injustice by admitting statements which he himself gave voluntarily under the sanctity of an oath.

Under our rules, the verdict of the court sitting without a jury must not be set aside on the evidence unless clearly erroneous. General Rules of Practice and Procedure, part 4, rule 7(c) ; *Edwards v. State,* 198 Md. 132, 153-154, 81 A. 2d 631, 639, 26 A. L. R. 2d 874; *Kaufman v. State,* 199 Md. 35, 85 A. 2d 446; *Anello v. State,* 201 Md. 164, 93 A. 2d 71. Viewing the entire record, we find that the verdict of the Court was not clearly erroneous. The judgment thereon will therefore be affirmed.

*Judgment affirmed, with costs.*