27 A.3d 616

**In re ANTONETTE H.**

**No. 0944, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Aug. 31, 2011.

342

Brian M. Saccenti (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: GRAEFF, WATTS, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), J.

The appellant, Antonette H., adjudicated to be delinquent in the Circuit Court for Prince George's County for an act that would have been theft if committed by an adult, presents us with a delightful dilemma. The evidence was legally sufficient to support the inference that the appellant was a receiver of stolen goods (or, in more modern terms, a criminal possessor) or to support the alternative inference that she was the original "handholding" thief for whom the hue and cry could have been raised (with full credit for both a caption and an asportation). The appellant is happy to accede to the State's choice of either option, but, she stoutly maintains, if she is to be treated as the receiver (or criminal possessor), then she was prosecuted in the wrong state. If, on the other hand, she is to be treated as the actual thief who took, stole, and carried away the property, then her conviction was fatally inconsistent with her acquittal for an act that was an indispensable component of the taking and carrying away. The appellant has successfully impaled the State on the horns of the dilemma.[1]

**The Common Basis For The Two Alternative Inferences**

On August 11, 2009, at 6:30 A.M., Robert Tucker parked his 1995 Jeep Cherokee in the parking lot of his apartment

---

1. The fact that this appeal arose out of a juvenile delinquency adjudication rather than a criminal trial is, with respect to the contentions that are before us, a distinction without a difference. As Judge Greene pointed out for the Court of Appeals in *In re Anthony W.*, 388 Md. 251, 266, 879 A.2d 717 (2005):

 Whether specific protections provided to adult defendants would also be provided to juveniles was first discussed in depth in 1967 by the United States Supreme Court in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Because of the increasingly penal overtones of juvenile court systems, *Gault* held that juvenile proceedings which may lead to commitment in a state institution must measure up to the "essentials of due process and fair treatment."

 For present purposes, those "essentials" include the requirement that verdicts be consistent and the requirement that the Maryland court have territorial jurisdiction over the crime or delinquent act with which the juvenile stands accused.

building in Temple Hills, Prince George's County. At some time later that day (we are not told exactly when), he discovered that his car had been stolen. He had not, incidentally, left his keys in the car nor did he leave the motor running. At 4:30 P.M. on the next day, August 12, 2009, Officer Michael Milocheck of the Washington, D.C. Metropolitan Police Department observed the Jeep Cherokee being driven on Alabama Avenue in Washington Southeast. As he watched, the Cherokee suddenly struck a parked vehicle and came to a sudden and unintended stop. Three individuals abandoned the car and fled on foot. The appellant, who had been driving the car, was one of the three and was apprehended a short distance away.

The ignition to the car had been "punched out." Officer Milocheck explained that car thieves often "punch out" an automobile's ignition, a recognized technique for starting a car without a key. "The vehicle had a punched ignition consistent with that of stolen vehicles." When Mr. Tucker got his car back, he observed that one of the car's windows had been broken as well as the ignition's having been ripped out and that neither of these damages had been present when last he saw his car.

## A. Possession of Recently Stolen Goods

When the appellant was first observed behind the wheel of the stolen car, the time lapse since its original theft was something less than 34 hours. She qualified, therefore, for the possession of "recently stolen goods." *Debinski v. State,* 194 Md. 355, 359–60, 71 A.2d 460 (1950); *Butz v. State,* 221 Md. 68, 77, 156 A.2d 423 (1959); *Cason v. State,* 230 Md. 356, 358, 187 A.2d 103 (1963); *Anglin v. State,* 1 Md.App. 85, 93, 227 A.2d 364 (1967), *cert. denied,* 246 Md. 755 (1967).

## B. The Inadequately Explained Possession

The appellant took the stand and testified that when she first saw the Jeep Cherokee "around" her Washington neighborhood, it was being driven by a male friend named Marcus, one of the three occupants of the vehicle at the time of the

4:30 P.M. collision. The appellant explained that Marcus let her drive the car. She did acknowledge, however, that she knew full well the car had been stolen when she asked to drive it. That brings us face-to-face with the second requirement for an inculpatory inference. How, if at all, was the possession explained?

In announcing his verdict, the trial judge stated: "I don't find the Respondent's testimony all that credible. I do find the State's witnesses very credible." He then found the appellant guilty of theft on the basis of the inference of theft arising out of the *unexplained* possession of recently stolen goods. Let it be carefully noted at this point that the past participle "unexplained," as used in the caselaw, refers not simply to the total absence of an attempted explanation but also to the failure to present a plausible explanation, to wit, an explanation that is actually believed. In *Brewer v. Mele,* 267 Md. 437, 449, 298 A.2d 156 (1972), the Court of Appeals was painstaking in its phraseology in this regard:

> We have long and consistently held that exclusive possession of recently stolen goods, *absent a satisfactory explanation,* permits the drawing of an inference of fact strong enough to sustain a conviction that the possessor was the thief.

(Emphasis supplied). In *People v. Galbo,* 218 N.Y. 283, 290, 112 N.E. 1041, 1044 (1916), Judge (future Supreme Court Justice) Cardozo was also carefully precise:

> It is the law that recent and exclusive possession of the fruits of crime, *if unexplained or falsely explained,* will justify the inference that the possessor is the criminal.

(Emphasis supplied). Judge Prescott wrote to the same effect for the Court of Appeals in *Jordan v. State,* 219 Md. 36, 45, 148 A.2d 292 (1959):

> *His very implausible account of his close position with relation to the stolen vehicle, ... may well have led the court to conclude that his story was concocted out of the whole cloth.*

(Emphasis supplied). The appellant's attempted explanation in this case did not fly and was, therefore, no better than no explanation at all.

## The Road to Consolidated Theft

The launching pad of an unexplained or unsatisfactorily explained possession of recently stolen goods was in this case fully operational. It then became a question of where does the inference, once launched, go from there.

The inference could take off in either of two directions. The two destinations, however, are not unrelated. For several centuries at least, larceny and receiving stolen goods were separate crimes with separate and distinct elements. Larceny, of course, was one of the nine original common law felonies ("MR. & MRS. LAMB").[2] Although initially emerging out of the shadow of larceny as a form of accessoryship-after-the-fact, receiving stolen goods was fully recognized in England as a statutory crime in its own right by no later than 1827 by 7 & 8 Geo. IV, chapter 29, § 54. Maryland actually anticipated Parliament's passage of such a statute and created (or at least recognized) receiving stolen goods as an autonomous criminal offense by chapter 138 of the Acts of 1809.[3] *Jordan v. State,* 219 Md. 36, 43, 148 A.2d 292 (1959) ("Our statutes do not define the crime of receiving stolen property, they merely prescribe the punishment therefor."); *Henze v. State,* 154 Md. 332, 140 A. 218 (1928). Although receiving was regularly characterized as a larceny-related offense, the relationship between the two crimes was at times a tricky one. Unlike their latter-day, post–1979, descendants, they were once mutually exclusive. The original thief could not be a receiver, one of the explanations being that he could not unlawfully receive

---

**2.** Murder, Rape, Manslaughter, Robbery, Sodomy, Larceny, Arson, Mayhem, and Burglary.

**3.** The definitive analysis in Maryland of the crime of receiving stolen goods remains that done for this Court by Judge Orth in *Jackson v. State,* 10 Md.App. 337, 270 A.2d 322 (1970), *cert. denied,* 260 Md. 721 (1971). It is a necessary point of departure.

stolen property from himself. Conversely, it was always a successful defense to a charge of receiving if the alleged receiver were shown to have been the original thief.

By Chapter 849 of the Acts of 1978, effective as of July 1, 1979, however, Maryland brought both larceny and receiving stolen goods together (along with dozens of other larceny-related offenses) under the broad umbrella of the then new Consolidated Theft Act. *State v. Burroughs,* 333 Md. 614, 623, 636 A.2d 1009 (1994). That consolidated statute is now codified as Maryland Code, Criminal Law Article, §§ 7–101 through 7–110. The scope of the Consolidated Theft Act is set out, in part, in § 7–102(a):

Conduct described as theft in this part constitutes a single crime and includes the separate crimes formerly known as:
 (1) larceny;
 (2) larceny by trick;
 (3) larceny after trust;
 (4) embezzlement;
 (5) false pretenses;
 (6) shoplifting; and
 (7) receiving stolen property.

Section 7–104 is the operative criminal prohibition. That section spells out six separate modalities for committing the now very generic crime of theft. It is subsection (a) that essentially covers what would formerly have constituted common law larceny, as the subsection provides, in pertinent part:

A person may not wilfully or knowingly *obtain* or exert *unauthorized control* over property.

(Emphasis supplied). In Moylan, *Maryland's Consolidated Theft Law and Unauthorized Use* (MICPEL, 2001), § 4.2, p. 24, it is observed:

Even if the notion of exerting control is broad enough to subsume the narrower instance of obtaining control, *the focus on "obtaining" at least emphasizes the criminality of the defendant's conduct in the act of initial acquisition. It is the act* of obtaining unauthorized control *that most unam-*

*biguously embraces,* but no longer makes necessary, *what once were the trespassing, taking and carrying way elements of common law larceny.*

(Emphasis supplied). This subsection (a) remains the "heartland" of the new and broader crime of theft.

By contrast, it is subsection (c) that brings into the fold the related criminal behavior that once constituted the separate crime of receiving stolen property. Subsection (c) provides, in pertinent part:

A person may not *possess stolen personal property* knowing that it has been stolen, or believing that it probably has been stolen.

(Emphasis supplied). Moylan, *op. cit.,* § 6. 1, p. 39, notes with respect to the change from the crime of receiving into the crime of unlawful possession:

The key to understanding this aspect or subdivision of the theft law is to note and then to appreciate the significance of the name change from "receiving stolen goods" to "criminal possession." Any conduct that would, before July 1, 1979, have made one guilty of the common law offense of receiving stolen goods would now make one guilty of theft generally and of that subdivision of theft, § 7–104(c) known as criminal possession particularly. Criminal possession, however, is a broader crime than was receiving stolen goods, because several required elements of the earlier offense have been eliminated. The Subcommittee Commentary noted in this regard: "This criminal possession concept is new to Maryland law. Its scope is broader than the crime of 'receiving stolen goods' which it encompasses."

(Emphasis supplied).

Just as larceny and receiving, before 1979, constituted distinct crimes with distinct characteristics, the separate modalities for committing theft continue to possess, post 1979, distinct characteristics. Although subsection (a) and subsection (c) are no longer mutually exclusive (as their progenitors once were), they are nonetheless different, as are the respective inferences that lead to them. It is no longer a successful

defense to subsection (c) that one is actually guilty under subsection (a). Since theft is now a single and all-embracing crime, transferring one's guilt from subsection (c) to subsection (a) would just be a case of "out of the frying pan into the fire."

### A Choice of Inferences

Just as the subsection (a) modality of theft, the *obtaining* of unauthorized control, and the subsection (c) modality, the criminal *possession*, remain distinct, so too are the inferences distinct that may lead to those respective conclusions. From the common denominator predicate of inadequately explained possession of recently stolen goods, a choice of inference arises, and the choice, post–1979, is indistinguishable from the choice, pre–1979. For either original crime or for either modality of the new consolidated crime, the proof would be by inference from the inadequately explained possession of the recently stolen automobile. *Brewer v. Mele*, 267 Md. at 449, 298 A.2d 156, described the choice of inferences:

> We have long and consistently held that exclusive possession of recently stolen goods, absent a satisfactory explanation, permits the drawing of *an inference of fact* strong enough to sustain a conviction *that the possessor was the thief* ... *or*, under appropriate circumstances, *that the possessor was a receiver of stolen goods.*

(Emphasis supplied).

The avenues of proof for these two distinct modalities of consolidated theft are as distinct today as they were for the two predecessor crimes before 1979. The contrast between the two modalities of theft is as sharp as ever was the contrast between the predecessor crimes. *Offutt v. State*, 55 Md.App. 261, 264–65, 463 A.2d 876, *rev'd on other grounds*, 297 Md. 520, 467 A.2d 181 (1983), is on point:

> The evidence was legally sufficient to support the finding of guilt in two separate ways. The law is settled that *at least two separate permitted inferences may follow from the predicate fact of possession of recently stolen goods.*

"In the present case, *the evidence was,* therefore, *legally sufficient to support a jury finding that the appellant was the thief within the contemplation of the common law of larceny. That is now one of the forms of criminal conduct rendering him eligible for conviction under Maryland's new Consolidated Theft Statute.* Art. 27, § 342(a) [now CR Article, § 7–104(a) ] provides:

"A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized. . . ."

*In the alternative, the evidence was also legally sufficient to support a jury finding that the appellant was a receiver of stolen goods within the contemplation of the common law of receiving. That is also now one of the alternative forms of criminal conduct rendering him eligible for conviction under Maryland's new Consolidated Theft Statute,* Art. 27 § 342(c) [now CR Article, § 7–104(c) ] provides:

"A person commits the office of theft if he possesses stolen personal property knowing that it has been stolen."

(Emphasis supplied). *Rice v. State,* 311 Md. 116, 135, 532 A.2d 1357 (1987) ("[T]he same evidence of possession will support each of two inconsistent views of the appellant's *actus reus,* that is, it will support inference of violation of either subsection.").

### Inferential Similarities and Dissimilarities

With their long and distinct histories still vitalizing them, the subjects before us for examination are two separate and finely calibrated inferences and not a single undifferentiated inference. They may, to be sure, both establish generic theft, but they establish very different modalities of theft.

 With criminal possession, as was true with receiving stolen goods before it, a critical element of guilt is that the possessor (or receiver) either knew or had good reason to know that the goods were stolen. *Jordan v. State,* 219 Md. at 48–49, 148 A.2d 292; *Henze v. State,* 154 Md. at 341, 140 A. 218. The primary function of the inculpatory inference when dealing with this modality of theft (or formerly with the crime

of receiving) is to supply this critical element of scienter. The inference does not carry us anywhere in time or space; it goes only into the *mens rea* of the possessor. It is a sedentary inference, confined to the "here and now" of its predicate facts. It establishes the necessary scienter.

By contrast, with the subsection (a) modality of obtaining control, as formerly with larceny's elements of caption and asportation, there is generally no problem in concluding that the thief knew what he was doing. The concern is more with the *actus reus* than with the *mens rea*. What we seek to know is where the obtaining of control (or the trespassory taking and carrying away) happened and when it happened. The inculpatory inference in this regard is not concerned with scienter. See *Rice v. State*, 311 Md. at 135, 532 A.2d 1357 ("With respect to the mental state, subsection (c) has a scienter requirement absent in subsection (a)."). For proof of that modality of theft that once was classic larceny, the evidentiary instrument that is needed, rather, is the inferential magic carpet, carrying the fact-finder from the time and place of the unexplained possession back to a possibly far-removed place at some earlier time. Albeit arising from a common denominator predicate, these respective inferences do very different things. Modality (a) does not require a showing of scienter, but modality (c) does. Modality (c) does not require being transported from the here and now of present possession to a different place at a different time, but modality (a) does.

Although both inferences arise out of precisely the same factual predicate, there is a dramatic difference in what they do and how they do it. One could prove that the appellant committed a criminal act (stealing a car) in the State of Maryland on August 11, 2009. The other could prove that the appellant committed a different criminal act (criminal possession) miles away in the District of Columbia on a different day, August 12, 2009. That's a big difference, a difference deserving of some analytic attention.

As legally sufficient evidence of the appellant's guilt of theft, either of these two inferences arising from her unsatisfactorily explained possession of the recently stolen Jeep Cherokee could have been brought to bear. When brought to bear, what might these two very different inferences have done, and what impact might they have had on the possible guilt of the appellant?

## The Situs of Criminal Possession

■ Turning our focus first on the more sedentary inference, it would have been sufficient to show that the appellant would have been guilty, assuming that the crime occurred in Maryland, of criminal possession pursuant to § 7–104(c) or could have been guilty, prior to 1979, of the predecessor crime of receiving stolen goods. That inference would have supplied the critical element of scienter, the actual knowing or the good reason to know that the Jeep Cherokee was stolen.

■ The fatal problem in such a case, however, would not be with § 7–104(c)'s special *mens rea* of "knowing that it has been stolen, or believing that it probably has been stolen," but with Maryland's territorial jurisdiction over the offense. The situs of criminal possession is the place where the stolen car is shown to have been possessed. In this case, the situs of this particular modality of theft was Alabama Avenue in Washington, S.E. at 4:30 P.M. on August 12, 2009, or possibly shortly earlier that afternoon in the appellant's neighborhood, also in Washington, S.E. The situs is not where the original theft occurred, but where the subsequent criminal possession is shown to have occurred. There was no such criminal possession shown to have occurred in Maryland. This particular inference does not take us back to Maryland.

In *State v. Butler,* 353 Md. 67, 72–73, 724 A.2d 657 (1999), Judge Cathell discussed the critical geography of the crime situs:

Territorial jurisdiction describes the concept that *only when an offense is committed within the boundaries of the court's jurisdictional geographic territory,* which generally is with-

in the boundaries of the respective states, *may the case be tried in that state .... A person cannot be convicted here for crimes committed in another state.*

(Emphasis supplied). *See also West v. State,* 369 Md. 150, 158–61, 797 A.2d 1278 (2002).

In *Khalifa v. State,* 382 Md. 400, 421, 855 A.2d 1175 (2004), Judge Battaglia wrote for the Court of Appeals:

> We have stated that "it is well-settled in Maryland that a court must have territorial jurisdiction over a criminal defendant to exercise its jurisdiction, or power, over that defendant." The general rule under common law is that *a state has territorial jurisdiction over a defendant when the crime is committed with the State's "territorial limits."* Therefore, ordinarily, *"[a] person cannot be convicted here for crimes committed in another state."*

(Emphasis supplied). *And see Allen v. State,* 171 Md.App. 544, 558, 911 A.2d 453 (2006) ("The common law rule adhered to in Maryland is that 'a state has territorial jurisdiction over a defendant when the crime is committed with the States's territorial limits.' "); *West v. State,* 136 Md.App. 141, 146, 764 A.2d 345 (2000) ("It is outside Maryland's territorial jurisdiction to convict a person for offending the laws of the State of Maryland if the offense is committed in another state.").

The evidence does not support a conclusion that the act of criminal possession pursuant to § 7–104(c) took place in the State of Maryland. This particular inferential option, therefore, won't fly in terms of establishing territorial jurisdiction in Maryland.

## Can There Be a Trespassory Taking Without a Trespassory Taking?

■ The only way for the State to establish territorial jurisdiction in Maryland is to get aboard the other inference, the "magic carpet" inference carrying the State's proof from the here and now of Alabama Avenue in Washington, S.E. all the way to an apartment parking lot in Prince George's County and from August 12, 2009 back to August 11, 2009.

Such an inference, however, takes the criminality not part way back, but all the way back. It puts the appellant on that parking lot at the time when the Jeep Cherokee was taken and driven away and establishes her complicity in that crime. See *Grant v. State,* 318 Md. 672, 678–81, 569 A.2d 1237 (1990); *Rice v. State,* 311 Md. at 135–36, 532 A.2d 1357. The inference does not take her back there as a mere spectator. It implicates her in the theft itself.

Had the appellant been charged with the theft of the Jeep Cherokee and nothing else, there would be no problem. The problem ironically is that there were other charges. Pursuant to *State v. Williams,* 397 Md. 172, 916 A.2d 294 (2007), and long-standing Maryland caselaw, we must ask whether the appellant could properly have been found guilty of the original taking and carrying away of the Jeep Cherokee notwithstanding having been found not guilty of "punching out" its ignition. To the State's chagrin, our answer must be: "No."

There are parts of a whole that are sometimes indispensable to the very existence of the whole. One cannot be guilty of burglary, for instance, if found to be not guilty of the breaking and of the entering that are indispensable parts of the burglary. One cannot be guilty of robbery if not guilty of the underlying assault that is a necessary part of the robbery. One cannot be guilty of felony-murder if acquitted of the underlying felony.

What once was larceny is still the heartland of the Consolidated Theft Act. That core modality is spelled out in § 7–104(a), as it provides:

A person may not wilfully or knowingly obtain or exert unauthorized control over property. . . .

Section 7–101(d), in turn, defines the phrase "exert control," in pertinent part:

"Exert control" includes *to take, carry away* . . . property.

(Emphasis supplied). These are the classic elements of caption and asportation, the trespassory taking and carrying away of the personal property of another that characterized

and identified the felony of larceny since the founding of the common law. It is with just such a trespassory taking and carrying away that a possessor inferred to be the original thief is necessarily implicated. The inference does not stop one step short of that total identification. If cast as the thief, the defendant takes on the part in all of its attributes.

Under the facts of this case, "punching out" the ignition was a necessary part of what the thief (or the thieves) did. It was, *ipso facto,* the caption, as well as being the indispensable antecedent of the asportation. The thief had no key to the car. The car was too big and too heavy to have been carried away by hand. It had to be driven away, and that was only made possible by the "punching out" of the ignition. "Punching out" the ignition may not be a formal element of "obtaining and exerting unauthorized control" on all occasions, but it was a necessary factual component of this particular instance of obtaining and exerting control. As a person established by the inference to have been the original thief, the appellant had to have been involved in some capacity, as a principal or as an accessory, in that "punching out" of the ignition.

It was the finding of the court, however, that she was not so involved. The "punching out" was reflected in three possible counts. The first of them was tampering with a motor vehicle. At the conclusion of the delinquency hearing, the trial judge agreed with defense counsel that the evidence did not establish tampering.

DEFENSE COUNSEL: [T]here's no evidence that she personally did any tampering.

THE COURT: I'll tell you what. I agree with you as to the tampering charge.

Two other counts, the 8th and 9th, charged malicious destruction of property, the only difference between them being the value of the property maliciously destroyed. On these two counts, the State actually conceded that they had not been proved.

DEFENSE COUNSEL: Your Honor, there has been no evidence that she wilfully and maliciously damaged the

property in Prince George's County because this is a [charge] that she damaged the property in Prince George's County.

... And we have no information as to when the ignition may have been popped. There's no evidence the damages happened in Prince George's County.... [4]

THE COURT: *Does the State want to concede?*

THE PROSECUTOR: *You're right, Your Honor. The State would concede.*

THE COURT: *All right. As to eight and nine, not involved.*

(Emphasis supplied).

The irony, of course, is that although there may have been no eyewitnesses there on the parking lot in Prince George's County, the inference of theft was itself the legally sufficient evidence that the appellant was involved in "punching out" the ignition. All parties recognized that the unsatisfactorily explained possession of the recently stolen Jeep Cherokee permitted an inference of the totality of the theft, but failed to appreciate that the inference embraced all constituent elements, such as "punching out" the ignition, that were necessarily a part of that totality. If a defendant is found not to have done what the thief must have done, the defendant cannot be the thief.

We are not, of course, saying, as an abstraction, that one could not be guilty of the malicious destruction of ignition systems without being guilty of car theft or vice-versa. One who hates automobiles, for example, could with his screwdriver readily rampage through a parking lot "punching out" ignition after ignition with no intention of ever stealing a car. All we are saying is that, in the factual context of this particular case, the "punching out" of the ignition of the Jeep

---

4. How does the appellant suggest the Jeep Cherokee managed to get out of Prince George's County or even off the parking lot in Temple Hills? Was there evidence of a phantom tow truck? However dismissive we may be of the appellant's argument, however, the bottom line is that it worked. Even the State bought it.

Cherokee and the unlawful taking of the Jeep Cherokee were necessarily related parts of the same criminal act. To be a participant, in some capacity, in the theft of the car was, on this occasion, *ipso facto*, to have been a participant, in some capacity, in the "punching out" of the ignition. In this indivisible context, the inference of theft is necessarily the inference of malicious destruction. If the inference of theft can establish, as it unquestionably can, that the thief was also necessarily the burglar or the robber, because those crimes were intertwined with the theft, the inference can also establish that the thief was guilty of malicious destruction, if that crime was intertwined with the theft. The inference is that the thief did whatever was a necessary part of the theft.

### Conclusion

We are dealing with the converse of the old adage, "In for a penny, in for a pound." In our case, it is, "In for a pound, in for a penny." To be guilty of the totality is to be guilty of the fragments, both legal and factual, that are necessary parts of that totality. Given that the appellant was found to have been the car thief, if other evidence established that the stolen car left the parking lot at an excessive rate of speed, the inference could also convict the appellant of speeding. If in making its getaway, the stolen car knocked down and killed a pedestrian, the inference would help to prove the appellant's guilt for manslaughter. If the car theft involved the killing of the night watchman, the inference could convict the appellant of felony-murder. What is involved here is not some ancient and arcane legal principle with its provenance in the Magna Charta. It is simply the logic inherent in intelligent fact-finding.

### The *Price* Concurrence

With respect to the inconsistency issue, it is the State's position that the conviction for theft and the acquittal for the "punching out" of the ignition were not inconsistent in any way. Indeed, the State concedes: "Such a result [inconsistency in the verdicts], if true, would be impermissible, unless the trial judge explained any apparent inconsistency in the ver-

dicts. *Williams v. State [State v. Williams* ], 397 Md. 172, 190 [916 A.2d 294] (2007)." There was no such explanation in this case.

Merely in passing, however, the State does twice make mention of the concurring opinion of Judge Harrell in *Price v. State,* 405 Md. 10, 34–42, 949 A.2d 619 (2008), and of the distinction Judge Harrell makes between "legal inconsistency" and "factual inconsistency." *Id.* at 35–38, 949 A.2d 619. Those references by the State, however, were in the course of making its point that the court's verdicts in this case were not inconsistent in either sense. The State did not suggest that the distinction made by the concurring opinion in a case involving inconsistent verdicts of guilty and not guilty rendered in a jury trial might have any applicability in a case, such as this, involving verdicts rendered by the judge in a bench trial.

From the time of Judge Learned Hand's landmark decision in *Steckler v. United States,* 7 F.2d 59 (2d Cir.1925), followed up by Justice Holmes's *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), American law generally almost universally exhibited a tolerance toward an inconsistency between verdicts of guilty and not guilty in a jury trial. The reasons for that tolerance, well articulated by Chief Justice Rehnquist in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), turn on the unique characteristics of decision making by a lay jury, such as the need for compromise in arriving at a unanimous decision and the conferral of lenity by the jury for fear that the sentencing judge will not be sufficiently lenient. Maryland joined those ranks tolerating jury inconsistency with *Leet v. State,* 203 Md. 285, 100 A.2d 789 (1953), and remained there consistently until the *Price* case in 2008.

In contrast to that toleration of inconsistency on the part of juries, however, similar inconsistencies by judges in non-jury trials have almost universally been condemned. There was never any suggestion that such condemnation was limited to legal inconsistency and did not apply to factual inconsistency.

In the landmark decision of by Judge Henry Friendly in *United States v. Maybury*, 274 F.2d 899 (2d Cir.1960), followed by Judge Oppenheimer's decision for the Court of Appeals in *Johnson v. State*, 238 Md. 528, 209 A.2d 765 (1965), it was explained that such special considerations in jury trials as the need for unanimity and the guarantee of lenity in sentencing are not present when dealing with verdicts by a judge in a non-jury trial.

This traditional dichotomy between the toleration of a jury's inconsistency and the condemnation of a judge's inconsistency was dramatically eroded by the majority opinion of the Court of Appeals in *Price v. State.* The function of Judge Harrell's concurring opinion in *Price,* noting for the first time a distinction between legal inconsistency and factual inconsistency, was to limit the scope of the change being made by the majority opinion. *Price,* according to the concurrence, imposed on jury verdicts the same burden of legal consistency that had historically been imposed on verdicts in non-jury cases. The additional burden of factual consistency, according to the concurring opinion, was not also imposed, for all of the reasons that have distinguished decision making by a jury from decision making by a judge.

The purpose of the concurrence was to limit the change being made by Price, not to expand it. That disinclination of the concurring opinion to impose an additional burden of factual consistency on jury verdicts by no means suggests that the burden of rendering factually consistent verdicts should, for the first time, be subtracted from non-jury verdicts where no distinction between legal consistency and factual consistency has ever been made, as witness such cases involving factual inconsistency as *State v. Williams*, 397 Md. 172, 189–99, 916 A.2d 294 (2007); *State v. Anderson*, 320 Md. 17, 29–32, 575 A.2d 1227 (1990); *Johnson v. State*, 238 Md. 528, 540–46, 209 A.2d 765 (1965).

Quite aside from the fact that we have not been asked by the State to make so tectonic a shift in the Maryland law concerning verdict consistency in non-jury trials, we are not in

any way bothered by the specter of the concurring opinion in *Price*. The *Price* concurrence sought to limit what the *Price* majority opinion did to inconsistency on the part of a jury. Neither the majority opinion nor the concurrence had any bearing on non-jury trials. By minimizing the increased demand for consistency by juries, the *Price* concurrence did not thereby reduce the demand for consistency routinely imposed on judges. To decline to add for the first time an additional burden to B does not require that such a burden be subtracted from A. There is no doctrine of compelled symmetry.

**JUDGMENTS REVERSED; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**