916 A.2d 294

**STATE of Maryland**

v.

**Charles Phillip WILLIAMS.**

**No. 103, Sept. Term, 2005.**

Court of Appeals of Maryland.

Feb. 8, 2007.

**176**

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for petitioner.

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for respondent.

Argued before BELL, C.J., RAKER,*WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

This matter arises from the conviction and sentence of Charles Phillip Williams ("Williams") in the Circuit Court for Baltimore County. The theory of the prosecution was that Williams aided and abetted [1] Anthony Henderson and Cheryl Gaines in the attempted armed robbery of Ahmed Hussein, the operator of a Citgo gas station and convenience store located in Baltimore County. The trial judge found Williams guilty of attempted robbery with a dangerous weapon (Count 1); attempted robbery (Count 2); assault in the first degree (Count 3); attempted theft (Count 4); use of a handgun in the commission of a felony (Count 6); and use of a handgun in the commission of a crime of violence (Count 7). Williams was charged with, but acquitted of, wearing, carrying or transporting a handgun (Count 5) [2] and two counts of possession of a firearm (Counts 8 and 9).

In this case, we have been asked to decide whether the Circuit Court judge rendered inconsistent verdicts when he convicted Williams of attempted robbery with a dangerous weapon, assault in the first degree, and use of a handgun in the commission of a crime of violence and a felony, but found him not guilty of wearing, carrying or transporting a handgun. We answer in the affirmative. In this case, the trial judge

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. The prosecution argued that Williams was the aider and abettor because he was acting as a "look-out" and "acting as a get-away driver."

2. The indictment lists the charge, as to Count 5, as wearing, carrying and transporting a handgun upon and about Williams's person. Although Williams was not specifically charged with transporting or possessing a handgun solely in his vehicle, the trial judge limited his findings, as to whether Williams wore, carried, or transported the handgun, to the time period that the handgun was in Williams's vehicle.

failed to acknowledge and explain the inconsistent verdicts. We therefore hold that the guilty verdicts for attempted robbery with a dangerous weapon, assault in the first degree, and use of a handgun in the commission of a crime of violence and a felony must be vacated, and, accordingly, we affirm the judgment of the Court of Special Appeals.

## BACKGROUND

We adopt the facts as set forth by the Court of Special Appeals in its unreported opinion. *Williams v. State*, No. 2037, September Term, 2003. In addressing Williams's appeal, the intermediate appellate court stated as follows:

On the morning of February 6, 2003, Ahmed Hussein was working as a cashier at the Citgo gas station and convenience store located at 620 Edmonson Avenue in Baltimore County. At approximately 6:30 a.m., a man and a woman entered the store. Hussein, who had been outside, followed them inside. At trial, Hussein testified that the man and woman were wearing masks, but it was "very cold" and they said good morning so he believed that they were "regular customers."

When Hussein entered the store's cashier room, the man told him to lay down. As Hussein turned around, he saw the man pointing a gun at his chest. Hussein did not lay down. Instead, he tried to close the door, but the man prevented him from doing so with his leg. The man twice told Hussein to lay down, then fired the gun at the floor, missing Hussein's feet by a few inches. After the shot was fired, the man cursed and he and the woman left the store. Hussein called the police.

Mandy Thurston lives near the Citgo station. At approximately 6:30 a.m. on the morning in question, she was preparing to leave for school and went outside to warm up her car. At that time, Thurston observed a red Acura pull up in front of a bar, which was located directly across the street from Thurston's vehicle.[ ] Thurston stated that she "saw a lot of movement ... in the car like they were

covering their faces." However, she could not see the individuals. The Acura then made a U-turn and drove off.

Thurston next saw a man and a woman walking up Old Edmondson Avenue toward the Citgo. According to Thurston, they did not have anything on their heads, and their faces were visible as they came up the street, although they were too far away for her to identify them. She then saw the Acura again, which backed into a parking space on the side of the bar. The man and woman exited the Citgo station and were "hurrying" toward the Acura. After they entered the vehicle, it "took off a little bit faster" than Thurston had seen the car traveling previously. Thurston started to drive to school, but turned around when she saw the police heading toward the Citgo station. At the Citgo station, she gave a description of the red Acura to the police, noting that it had bumper damage to the left side of the vehicle.

Detective James Bonsall testified that, on February 6, 2003, he was in plain clothes and traveling in an unmarked car, which was equipped with a blue light on the dashboard, but not a siren. At that time, he heard the broadcast for a vehicle involved in a robbery. The vehicle was described as a red, two-door Acura with silver along the bottom of the car and damage to the left rear with the bumper hanging down. A tag number was also provided. At approximately 11:46 a.m., a few miles from the Citgo, the detective observed a vehicle matching that description.

Detective Bonsall followed the Acura and radioed for assistance. He was then advised that City police units were on the way. Detective Bonsall continued to follow the Acura while waiting for assistance. The Acura was driving normally and did not commit any traffic infractions, nor did the driver attempt to elude Bonsall.

Bonsall recalled that, after turning onto Winchester Street, the Acura traveled about a block to a block and a-half before the driver pulled the vehicle to the curb. The detective pulled over approximately three car lengths behind the Acura. The driver waited about thirty seconds

before starting to get out of the vehicle. When the driver of the Acura appeared as if he were exiting the car, Bonsall began to get out of his vehicle. The detective crouched behind the car door and placed his hand on his weapon, but then the Acura "took off." Detective Bonsall "never reached that point where he was able to identify" himself as a police officer. The detective continued to follow the vehicle. At some point, a helicopter joined the pursuit.

The Acura made a U-turn and Detective Bonsall "got a good look at the face of the driver." Although Bonsall eventually lost sight of the Acura, the police helicopter indicated that the car had stopped at the end of the 500 block of Longwood Street and that the driver had gone onto the porch of the residence at 501 Longwood Street. Although the police conducted an extensive search, the driver was not found.

On February 7, 2003, the day after the attempted robbery, Detective Bonsall viewed a photographic array and identified [Williams] as the driver of the Acura. The detective also made an in-court identification of [Williams].

Corporal Todd Edelin testified that the Acura was abandoned two and a-half to three miles from the Citgo station, in the 500 block of North Longwood Street in Baltimore City. He determined that the vehicle was registered to [Williams]. He showed Thurston pictures of the vehicle and she immediately stated: "That's the car."

Edelin responded to the address listed on the Acura's registration and spoke with [Williams]'s mother. She confirmed that the Acura belonged to him and indicated that [Williams] had been staying with her "off and on, but he had a drug problem and she hadn't seen him in awhile." Edelin obtained a search warrant for the vehicle. In the ensuing search, he recovered [William]'s driver's license, a black knit hat, a black skull cap, and a pair of black cloth gloves.

[Williams] was arrested on April 3, 2003. He was advised of his *Miranda* rights,[ ] agreed to waive those rights, and made a statement. Corporal Edelin offered the following testimony regarding [Williams]'s statement:

[PROSECUTOR]: And what, if anything did [Williams] tell you?

[EDELIN]: He stated that he was driving that car that day, his car, the Acura, helping two friends out. They were supposed to go to Catonsville to a house in Catonsville to get money from a friend of the co-defendant's, and when they got to the house, no one was home.

When they were driving back, he said the co-defendant wanted to stop for cigarettes at a gas station, and they stopped. He backed into a parking lot behind the gas station to do his heroin, and the two passengers got out and went into the gas station, came back, and then they went back to Longwood....

[PROSECUTOR]: What did he tell you happened when they got back to Longwood?

[EDELIN]: He said, when they were back at Longwood, the two got into an argument over what happened at the gas station.

[PROSECUTOR]: When you say the two, who do you mean?

[EDELIN]: Anthony Henderson, the codefendant, and Cheryl Gaines, the female girlfriend of Anthony Henderson.

He said they got into an argument about what went on at the gas station. She was asking why he did that, and then the defendant asked—said he asked what went on, and they told him that they went in to get money and the gun went off accidentally, and he said he freaked out and basically said he didn't know anything happened when he was at the gas station until afterward back at Longwood.

\* \* \* \* \* \*

[PROSECUTOR]: What did he [Williams] tell you Tony Henderson was trying to do in the store?

[EDELIN]: He said initially he was to get cigarettes, but when he found out back at the house, he said he went to get money to help him, to help the defendant out.

[PROSECUTOR]: What did that mean? Did he say what that meant?

[EDELIN]: His drug problem.

[Williams] also informed the corporal that Henderson had been arrested at 525 Longwood Street and that the police had recovered a handgun. [Williams] believed it was the gun used at the Citgo Station. Williams stated that, prior to the armed robbery, he had seen Henderson on Longwood Street with the gun.

Further, Williams informed Corporal Edelin that, following the attempted robbery, he was driving the Acura when he realized he was being followed by a green car driven by a white male. At that point, [Williams] pulled over. The white male also pulled over and got out of the vehicle. According to [Williams], the white male "pulled a gun on" him so he jumped back in his car and sped away. Williams stated that he did not know that the white male was a police officer; he explained that he thought that someone was pulling a gun on him, because he was in an open-air drug market where a lot of criminal activity occurred. [Williams] drove to the 500 block of North Longwood Street, got out of his car, walked up the alley, and entered the residence at 501 North Longwood Street.

After interviewing [Williams], Corporal Edelin confirmed that Henderson had been arrested in Baltimore City. Henderson's residence, 525 North Longwood Street, was searched by Baltimore City Police detectives and a 9 millimeter semiautomatic Beretta was recovered. Baltimore County Police had recovered bullet fragments from the floor of the cashier's room in the Citgo station, and ballistics tests determined that the bullet fired in the store came from that Beretta.

Williams testified in his own defense. He stated that, on the morning in question, he parked his car and Henderson and Gaines got out to buy cigarettes at the convenience store. [Williams] moved his car because he was "going to use drugs." Henderson and Gaines went into the Citgo Station, then came back to his car. They were not running

and were not wearing masks. In addition, they had cigarettes in their possession and did not tell him that they had robbed the Citgo Station.

[Williams] drove back to Longwood Street, arriving there at about 6:50 a.m. He recalled that Gaines "was scared" and she asked Henderson "why did he do that[?]" The three went into the house, where Henderson informed [Williams] that he had robbed the Citgo station. [Williams] and Henderson argued and [Williams] eventually drove towards his mother's residence. [Williams] explained that his mother is a Baltimore City Police Officer and he intended to ask her for advice. While en route to his mother's residence, Detective Bonsall began to follow [Williams].

Williams said he pulled over on Winchester Street, but when he started to get out of the Acura, he looked in his side view mirror and saw that the detective was also exiting his vehicle. When [Williams] observed the detective "going for a gun," he "pulled off." [Williams] stated that he did not hear any sirens or see any emergency lights. In addition, he did not hear the police helicopter until he exited his vehicle. Later, [Williams] left his Acura on Longwood Street and went to a friend's house.

[Williams] added that Henderson had shown him the handgun prior to the attempted robbery. He also acknowledged that he saw the weapon again after the incident, when the group returned to Longwood Street.

In reaching its verdict, the trial court stated, in part:

There is no question this is a close case, but there is no question in the court's mind that [Williams] was present. He admits he was present. His conduct is that of a person with consciousness of guilt. That is the disturbing thing.

And his conduct, even prior to the event, is indicative of complicity in the events. The witness sees some covert activity in the car, some apparent attempt, according to her, gestures and so forth, apparent attempts to cover up

partially, if not wholly conceal the identity of the two persons that got out of the car.

Going for cigarettes, why not park on the parking lot of the Citgo Station? Why park covertly in a hidden fashion, backing into a parking space behind the station where the passengers have to go through a fence in order to get to the store? If you are just going to buy cigarettes, you pull into the gas station. That is the kind of thing that makes his story just not quite buyable.

He is an almost believable witness. He testifies with a great deal of assurance with what happened. He seems cooperative with the police. That is much in his favor. There is no question about that, but I think at that point, he is trying to figure out a way, having sat in the car for several hours, how am I going to get out of this, how am I going to get out of this[?]

He is trying to say, well, what I have to do is I have to own up to everything and I have to let them know who the perpetrator was and cooperate with them and maybe I will be believed that I didn't have any knowledge of it before hand. And you are close to that point, Mr. Williams, but not quite close enough.

The court believes that you were knowledgeable about the events, that you were complicit in the events and that you are guilty of aiding and abetting in the commission of this attempted robbery.

The count, first count of attempted armed robbery is sustained. I find the defendant guilty of that because of his position as an aider and abettor. With respect to the remaining counts, robbery, of course, would merge into armed robbery or attempted armed robbery, as would assault. Theft is an element of robbery.

*Now, the handgun in the vehicle, I don't think there is sufficient evidence to establish that he carried the weapon in his vehicle. I think that the perpetrator, the co-defendant, was the person that was carrying the*

*weapon. It is a bit of a stretch to find him guilty of the handgun in the vehicle charge.*

* * * * * *

Certainly, there is no question that a handgun was used. A handgun was discharged, and to the extent he had knowledge of the events about to take place or that did take place in the event, he is equally guilty of that, as well.

Without explanation or comment, the court also found appellant not guilty of the two counts of unlawfully possessing a regulated firearm [Counts 8 and 9].

The court then summarized its rulings:

So, recapping, count one, guilty; count[s] two, three and four, merged; count five, not guilty; count six, guilty. I guess technically seven would be equally guilty, although it is just merged for sentencing purposes. Eight and nine, not guilty.

The Court of Special Appeals compared the "use" of a handgun to the "possession" of a handgun and determined that the Legislature intended "use" to be something more than "possession"—an active, rather than passive operation or employment of a handgun. In reviewing the trial court's findings, the Court of Special Appeals held that it was "unable to conclude that the verdicts were not inconsistent." It continued: "If [Williams] was found to have used the handgun in the commission of the robbery, he must also have possessed the handgun. This is especially so in light of the trial court's findings that [Williams]'s conduct, 'even prior to the event, is indicative of complicity in the events.'" The intermediate appellate court acknowledged that there existed no evidence that Williams actually possessed the handgun but noted that his convictions were not based on his actual use of the handgun; they were based on Henderson's use of the handgun and Williams's complicity in Henderson's actions. The court explained that before Williams could use the gun, he had to have possessed it and the trial court failed to explain that inconsistency. As such, the Court of Special Appeals reversed

Williams's convictions for attempted robbery with a dangerous weapon, assault in the first degree, and use of a handgun in the commission of a crime of violence and a felony. It affirmed all of the other verdicts and remanded the case to the Circuit Court for a new sentencing. Subsequently, the State filed a petition for writ of certiorari [3] in this Court, which we granted. *State v. Williams*, 390 Md. 284, 888 A.2d 341 (2005).

## DISCUSSION

The State contends that the Court of Special Appeals incorrectly determined that the verdicts were inconsistent because this Court has held that, in Maryland, the common law doctrine of accessoryship is applicable solely to felonies. The State cites *State v. Ward*, 284 Md. 189, 396 A.2d 1041 (1978), for this principle, and then explains that, in contrast, there is no accessoryship for misdemeanors because all participants are principals. *See State v. Hawkins*, 326 Md. 270, 604 A.2d 489 (1992). The State posits that because of this distinction, the intermediate appellate court erred in determining that the trial court's verdicts were inconsistent. The State concedes that "the Court of Special Appeals was correct as to Williams's convictions for the merged misdemeanor offenses of use of a handgun in the commission of a felony and in the commission of a crime of violence...." The State argues, however, that the intermediate appellate court "was incorrect as to Williams's conviction of the felonies of attempted armed robbery and first degree assault ... [because] [t]he Court of Special Appeals failed to recognize that, in regard to felonies, one may be culpable as an accomplice, while, for misdemeanors, the offender must be a first degree principal." The State notes that Williams admitted to driving Henderson and Gaines

---

3. The State presented the following issue in its petition for writ of certiorari:

Did the Court of Special Appeals incorrectly hold that the sentencing court's verdict finding Williams guilty, as an accomplice, of attempted armed robbery and first degree assault was inconsistent with the trial court's acquittal of Williams of wearing[,] carrying and transporting a handgun?

to the gas station, acknowledged that Henderson and Gaines attempted to rob Mr. Hussein at gunpoint, and that he then drove Henderson and Gaines away from the scene after the crime. Therefore, the State argues, the evidence fully supported the trial court's verdicts. The State avers that because the trial court determined that Williams was not a principal as to the handgun possession count but was guilty of attempted robbery with a dangerous weapon and assault in the first degree as an aider and abettor, the verdicts are in no way inconsistent. Accordingly, the State requests that this Court reverse the judgment of the Court of Special Appeals in order to uphold and reinstate the trial court's convictions of Williams for the two felonies.

> Williams evaluates the State's claims and argues that
> [t]he State simply cannot have it both ways. If the trial [court]'s acquittal of the handgun possession charge was, as the State concedes, inconsistent with its finding of guilt as to the use of a handgun charges, it must also be inconsistent with the attempted armed robbery and first degree assault regardless of principalship and accessory law.

Williams explains that the trial court rendered inconsistent verdicts in this case and that such verdicts are not tolerated in bench trials. To support this proposition, Williams cites several Maryland cases including *Shell v. State,* 307 Md. 46, 512 A.2d 358 (1986), and *Stuckey v. State,* 141 Md.App. 143, 784 A.2d 652 (2001), where this Court and the intermediate appellate court, respectively, determined that the verdicts of guilty were inconsistent and that the inconsistent verdicts of guilty could not stand. Williams argues that proof that he possessed a handgun was required before the court could convict him of using a handgun and attempting to commit a robbery with a handgun. As such, and in accordance with *Shell* and *Stuckey,* the trial court's act of acquitting Williams of wearing, carrying, or transporting a handgun precluded the court from finding Williams guilty of the following crimes: using a handgun in the commission of a crime of violence and a felony, attempting to commit a robbery using that handgun, and assault in the first degree using that handgun. Williams also

contends that the trial judge failed to explain the inconsistency and that, therefore, the inconsistent verdicts cannot stand.[4] Williams concludes that the only appropriate remedy is to reverse or vacate the inconsistent verdicts of guilty as the Court of Special Appeals did in its unreported opinion. We agree with Williams and the Court of Special Appeals that the convictions for attempted robbery with a dangerous weapon, assault in the first degree, and use of a handgun in the commission of a crime of violence and a felony are inconsistent with the acquittal for wearing, carrying or transporting a handgun.

---

4. In addition, Williams posits that the trial judge's actions in the case *sub judice* violated the Double Jeopardy principles of both the U.S. Constitution and Maryland common law because the charge of wearing, carrying, or transporting a handgun does not contain any additional elements than the charges of using a handgun in the commission of a felony or a crime of violence. Williams explains that a person cannot use a handgun without wearing, carrying, or transporting it on his person and also that the Legislature did not intend a separate punishment for wearing, carrying, or transporting a handgun than it did for using a handgun during the commission of a felony or crime of violence. *See Wilkins v. State,* 343 Md. 444, 682 A.2d 247 (1996). Lastly, Williams again cites *Stuckey* and notes that even though he was convicted of using a handgun in the commission of a felony or crime of violence in the same proceeding in which he was acquitted of wearing, carrying, or transporting a handgun, it is of no significance. The Court of Special Appeals agreed with Williams that these verdicts violated the Fifth Amendment prohibition against double jeopardy and Maryland common law double jeopardy principles.

 We need not address this Double Jeopardy contention because the State failed to present this question in its petition for writ of certiorari and we did not grant *certiorari* as to that issue. *See supra* footnote 3 (providing the question presented in the State's petition). The applicable provision is Rule 8-131, entitled **"Scope of review,"** specifically subsection (b), entitled **"In Court of Appeals—Additional Limitations."** This subsection provides, in pertinent part:

 > Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for appellate review by the Court of Appeals.

 In addition, we need not address the Double Jeopardy contention because our holding, *infra,* that the convictions for use of a handgun in the commission of a crime of violence and a felony must be reversed, renders the issue moot.

*Inconsistent Verdicts*

Verdicts are inconsistent if they are "[l]acking consistency; not compatible with another fact or claim." BLACK'S LAW DICTIONARY 781 (8th ed.1999). It has been the position of this Court that inconsistent verdicts in jury trials are permissible in criminal cases.[5] *See, e.g., Galloway v. State,* 371 Md. 379, 408, 809 A.2d 653, 671 (2002); *Hoffert v. State,* 319 Md. 377, 384, 572 A.2d 536, 540 (1990); *Shell,* 307 Md. at 54, 512 A.2d at 362; *Johnson v. State,* 238 Md. 528, 541, 209 A.2d 765, 771 (1965). In *Hoffert,* 319 Md. at 384, 572 A.2d at 540, we stated that, in criminal cases, "inconsistent verdicts by a jury 'are normally tolerated....' " and explained that

> [t]his is so because of "the unique role of the jury, and has no impact whatsoever upon the substantive law explicated by the Court." Due to the singular role of the jury in the criminal justice system, "there is a reluctance to interfere with the results of unknown jury interplay, at least without proof of 'actual irregularity.' "

(citations omitted). In *Galloway,* this Court explained the rationale for this principle:

> [C]onvictions based on inconsistent jury verdicts are tolerated because of the singular role of the jury in the criminal justice system.... The general view is that inconsistencies may be the product of lenity, mistake, or a compromise to reach unanimity, and that continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it.

371 Md. at 408, 809 A.2d at 671 (citing *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)). Notwithstanding, it is also well settled in Maryland "that inconsistent

---

**5.** We do not intend our discussion to impact the treatment of inconsistent verdicts in civil cases as, we have previously stated, "there remains a distinction between inconsistent verdicts in criminal cases[ ] and *irreconcilably inconsistent jury verdicts* in civil matters ... [in civil cases] irreconcilably defective verdicts cannot stand." *Southern Management Corp. v. Taha,* 378 Md. 461, 488, 836 A.2d 627, 642 (2003) (citations omitted).

verdicts of guilty and not guilty, by a trial judge at a nonjury trial, are not ordinarily permitted." *State v. Anderson*, 320 Md. 17, 29, 575 A.2d 1227, 1233 (1990) (citations omitted); *see also Shell*, 307 Md. at 54–55, 512 A.2d at 362–63. We draw such a distinction because of our determination that:

> "None of these considerations justifying inconsistent jury verdicts is fairly applicable to the trial of a criminal case before a judge. There is no 'arbitral' element in such a trial. While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity, the judge is hardly the 'voice of the country,' even when he sits in the jury's place. . . . There is no need to permit inconsistency in the disposition of various counts so that the judge may reach unanimity with himself; on the contrary, he should be forbidden this easy method for resolving doubts. . . . We do not believe we would enhance respect for law or for the courts by recognizing for a judge the same right to indulge in 'vagaries' in the disposition of criminal charges that, for historic reasons, has been granted the jury."

*Galloway*, 371 Md. at 408–09, 809 A.2d at 671 (quoting *United States v. Maybury*, 274 F.2d 899, 903 (2d Cir.1960)).

When a trial judge renders inconsistent verdicts, "[t]he remedy is to reverse or vacate the verdict entered on the inconsistent guilty verdict." *Anderson*, 320 Md. at 29, 575 A.2d at 1233; *see also Shell*, 307 Md. at 56, 512 A.2d at 363–64; *Johnson*, 238 Md. at 543, 209 A.2d at 772. "Where, however, there is an apparent inconsistency in the verdicts at a nonjury trial, but where the trial judge on the record satisfactorily explains the apparent inconsistency, the guilty verdict may stand." *Anderson*, 320 Md. at 29–30, 575 A.2d at 1233; *see also Shell*, 307 Md. at 56, 512 A.2d at 363–64; *Johnson*, 238 Md. at 544–45, 209 A.2d at 772. "If 'there is only an apparent inconsistency which in substance disappears upon review of the trial court's explanation,' the guilty verdict will not be vacated." *Anderson*, 320 Md. at 30, 575 A.2d at 1233 (quoting *Shell*, 307 Md. at 57, 512 A.2d at 363).

The case *sub judice* was not a jury trial. We must therefore determine (1) whether the guilty verdicts were inconsistent with the not guilty verdict of possession of the handgun, and, if so, (2) whether the trial court explained the reasons for that inconsistency. The convictions specifically at issue here are attempted robbery with a dangerous weapon,[6] assault in the first degree,[7] and use of a handgun in the commission of a crime of violence and a felony.[8] The other charge at issue is

---

**6.** Md.Code (2002, 2006 Cum.Supp.), § 3–403 of the Criminal Law Article, entitled **"Robbery with a dangerous weapon"** states:

> Prohibited
>
> (a) A person may not commit or attempt to commit robbery under § 3–402 of this subtitle:
>
> (1) with a dangerous weapon; or
>
> (2) by displaying a written instrument claiming that the person has possession of a dangerous weapon.
>
> Penalty
>
> (b) A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

**7.** Md.Code (2002, 2006 Cum.Supp.), § 3–202 of the Criminal Law Article, entitled **"Assault in the first degree"** states:

> Prohibited
>
> (a)(1) A person may not intentionally cause or attempt to cause serious physical injury to another.
>
> (2) A person may not commit an assault with a firearm, including:
>
> (i) a handgun, antique firearm, rifle, shotgun, short-barreled shotgun, or short-barreled rifle, as those terms are defined in § 4–201 of this article;
>
> (ii) an assault pistol, as defined in § 4–301 of this article;
>
> (iii) a machine gun, as defined in § 4–401 of this article; and
>
> (iv) a regulated firearm, as defined in § 5–101 of the Public Safety Article.
>
> Penalty
>
> (b) A person who violates this section is guilty of the felony of assault in the first degree and on conviction is subject to imprisonment not exceeding 25 years.

**8.** Md.Code (2002, 2006 Cum.Supp.), § 4–204 of the Criminal Law Article, entitled **"Use of handgun or antique firearm in commission of crime"** states:

> Prohibited
>
> (a) A person may not use an antique firearm capable of being concealed on the person or any handgun in the commission of a crime of violence, as defined in § 5–101 of the Public Safety Article, or any felony, whether the antique firearm or handgun is operable or inoperable at the time of the crime.

the wearing, carrying, or transporting of a handgun, which resulted in the trial judge entering a verdict of not guilty.[9]

### Common Law Doctrine of Accessoryship

We agree with the State that there are differences between misdemeanors and felonies, in the application of the law of accessoryship in Maryland, but disagree that those differences render the verdicts consistent, as a matter of law, in this case.

 This Court has established that the common law doctrine of accessoryship is applicable to felonies only. *State v. Sowell,* 353 Md. 713, 728 A.2d 712 (1999); *State v. Ward,*

---

Penalty
(b)(1)(i) A person who violates this section is guilty of a misdemeanor and, in addition to any other penalty imposed for the crime of violence or felony, shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years.
(ii) The court may not impose less than the minimum sentence of 5 years and, except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole in less than 5 years.
(2) For each subsequent violation, the sentence shall be consecutive to and not concurrent with any other sentence imposed for the crime of violence or felony.

9. Md.Code (2002, 2006 Cum.Supp.), § 4–203 of the Criminal Law Article, entitled **"Wearing, carrying, or transporting handgun"** states, in pertinent part:
Prohibited
(a)(1) Except as provided in subsection (b) of this section, a person may not:
(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;
(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;
(iii) violate item (i) or (ii) of this paragraph while on public school property in the State; or
(iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person.
(2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.
This provision includes an exception for law enforcement officials and other individuals licensed to carry a handgun, but those exceptions do not apply to the case *sub judice.*

284 Md. 189, 396 A.2d 1041 (1978). In *Sowell*, 353 Md. at 718–19, 728 A.2d at 715 (quoting *Ward*, 284 Md. at 197, 396 A.2d at 1046–47), we outlined the differences between the various degrees of principals and accessories. We explained that "[a] principal in the first degree is one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent." *Id.* To the contrary, a principal in the second degree "is one who is guilty of [a] felony by reason of having aided, counseled, commanded or encouraged the commission thereof in his presence, either actual or constructive." *Id.* A principal in the second degree differs from an accessory before the fact because an accessory before the fact "is one who is guilty of [a] felony by reason of having aided, counseled, commanded or encouraged the commission thereof, without having been present either actually or constructively at the moment of perpetration." *Id.* (emphasis added). Lastly, an accessory after the fact "is one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment." *Id.*

These differences, however, are not applicable to misdemeanors because, in Maryland, the principles of accessoryship apply only to felonies; as to misdemeanors, all participants in a crime are considered principals. "When a person embraces a misdemeanor, that person is a principal as to that crime, no matter what the nature of the involvement. In the field of felony, however, the common law divides guilty parties into principals and accessories." *State v. Hawkins*, 326 Md. 270, 280, 604 A.2d 489, 494 (1992); *accord State v. Raines*, 326 Md. 582, 594 n. 1, 606 A.2d 265, 270 n. 1 (1992).

In the instant case, the trial judge found Williams guilty of attempted robbery with a dangerous weapon, attempted robbery, and assault in the first degree, all felonies, predicated on his participation as an "aider and abettor." The trial judge explained that Williams was not a principal in the first degree as to those crimes, and that it was Henderson and Gaines, and not Williams, who actually entered the Citgo

station. While the judge did not use the words "principal in the second degree," he stated that Williams was guilty as an "aider and abettor," that he was "complicit in the events" and that "there is no question in the court's mind that [Williams] was present." We therefore interpret the trial judge's language and convictions of Williams as an "aider and abettor" to mean that Williams was found guilty as a principal in the second degree as to his involvement in the crimes mentioned.[10]

We have held that when a specific intent is a necessary element of a particular crime one cannot be a principal in the second degree to that offense unless such person entertained such an intent or knew that the principal in the first degree entertained such intent.

\* \* \* \* \* \*

"To be guilty as a principal in the second degree, a criminal intent is necessary." "Aid or encouragement to another who is actually perpetrating a felony will not make the aider or encourager guilty of the crime if it is rendered without mens rea. It is without mens rea if the giver does not know or have reason to know of the criminal intention of the other. . . . In general it is the abettor's state of mind rather than the state of mind of the perpetrator which

---

10. *See supra State v. Sowell*, 353 Md. 713, 718, 728 A.2d 712, 715 (1999) (stating that a principal in the second degree "is one who is guilty of [a] felony by reason of having aided, counseled, commanded or encouraged the commission thereof in his presence, either actual or constructive"); *Pope v. State*, 284 Md. 309, 331, 396 A.2d 1054, 1067 (1979) (explaining that "[t]he principal in the second degree differs from the principal in the first degree in that he does not do the deed himself or through an innocent agent but in some way participates in the commission of the felony by aiding, commanding, counseling or encouraging the actual perpetrator"); *see also Stebbing v. State*, 299 Md. 331, 373, 473 A.2d 903, 924 (1984) (explaining that an individual who drives a getaway car and waits outside a convenience store while the perpetrator robs the store, is guilty as a principal in the second degree of robbery and the person who actually robbed the store is guilty as a principal in the first degree of robbery); *McBryde v. State*, 30 Md.App. 357, 360, 352 A.2d 324, 327 (1976) (stating that "persons waiting in a getaway car during the commission of a felony . . . are principals in the second degree") (citing *Vincent v. State*, 220 Md. 232, 151 A.2d 898 (1959)).

determines the abettor's guilt or innocence ... '[I]ntention' includes not only the purpose in mind but also such results as are known to be substantially certain to follow."

*　　*　　*　　*　　*　　*

"To be an accomplice a person must participate in the commission of a crime knowingly, voluntarily, and with common criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime."

*　　*　　*　　*　　*　　*

"[W]hen two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts done in furtherance of the commission of the offense or the escape therefrom."
*State v. Raines*, 326 Md. 582, 594–98, 606 A.2d 265, 271–72 (1992) (citations omitted).

The evidence shows that Williams had the requisite *mens rea, i.e.,* that he knew or had reason to know of the criminal intentions of Henderson and Gaines, which the judge made clear when he stated that "the court believes that [Williams was] knowledgeable about the events, that [he was] complicit in the events and that [he is] guilty of aiding and abetting in the commission of this attempted robbery." The trial judge then convicted Williams of attempted robbery with a dangerous weapon, attempted robbery and assault in the first degree. Williams's complicity in the criminal events, therefore, rested on the fact that he aided and abetted the criminal acts of the others; namely, driving Henderson and Gaines to and from the crime scene, waiting for them in the car parked behind the gas station and acting to conceal their identity as they got out of the car. Thus, Williams was a part of the criminal enterprise and was responsible for all crimes committed in furtherance of that enterprise. Notwithstanding, the trial judge also stated that he did not believe that there was enough evidence to find that Williams actually or constructively possessed the handgun. He stated that it would have been "a bit of a stretch" to find that Williams possessed the handgun in the

vehicle, because it was Henderson who actually carried the handgun, and thus found Williams not guilty of wearing, carrying, or transporting it. In doing so, the trial judge rendered inconsistent verdicts and failed to explain how Williams was not in joint possession of the handgun used by Henderson and Gaines in the commission of the attempted robbery with a dangerous weapon and the lesser included offenses. *See Newman v. Commonwealth,* 437 Mass. 599, 773 N.E.2d 963, 967 (2002) (explaining that so long as there is sufficient evidence that an individual involved in an armed robbery is aware that the perpetrator has a gun, then the individual can be convicted as a joint venturer to the armed robbery charges without ever actually possessing the gun himself); *see also Price v. State,* 111 Md.App. 487, 498, 681 A.2d 1206, 1211 (1996) (noting that "in [a crime] in which control or dominion over . . . the instrumentality of the crime constitutes, or is the element of, the *actus reus,* the law engages in the legal fiction of constructive possession to impute inferentially criminal responsibility") (citing *Folk v. State,* 11 Md.App. 508, 518, 275 A.2d 184, 189 (1971)). According to the evidence, there was only one handgun used in this case. Williams, Henderson, and Gaines traveled to and from the Citgo station together in Williams's car, and Williams spent substantial time with the others before and after the armed robbery. Because the trial judge held that Williams did not possess the handgun, and the trial judge failed to adequately explain how Williams was not in joint possession of the gun, the verdicts are inconsistent and the guilty verdicts for attempted robbery with a dangerous weapon and assault in the first degree must be reversed.

■■■ The trial judge also found Williams guilty of attempted robbery and attempted theft, two crimes that do not require proof of the use of a handgun in order to sustain a conviction. It, therefore, was not necessary that Williams possess a handgun or have knowledge that Henderson and Gaines were going to use a handgun to commit those crimes. As such, the guilty verdicts for attempted robbery and attempted theft are consistent with the trial court's acquittal of

Williams for wearing, carrying or transporting a handgun. Accordingly, those verdicts can stand.

 There no longer appears to be any dispute as to whether the convictions for use of a handgun in the commission of a crime of violence and a felony are inconsistent with the acquittal for wearing, carrying or transporting a handgun because Williams contended, and the State conceded, that they are inconsistent. The State, in its brief to this Court, stated that "the Court of Special Appeals was correct as to Williams's convictions for the merged misdemeanor offenses of use of a handgun in the commission of a felony and in the commission of a crime of violence.... " In addition, the State conceded that the court was correct to vacate the handgun use convictions. We agree.

We reiterate that when one embraces a misdemeanor, he or she is a principal as to that crime no matter what the nature of his or her involvement, *Hawkins*, 326 Md. at 280, 604 A.2d at 494, and, in addition, "when two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts done in furtherance of the commission of the offense or the escape therefrom." *Raines*, 326 Md. at 598, 606 A.2d at 272. It is therefore irrelevant, in the present case, that some of the crimes committed in furtherance of the criminal enterprise were misdemeanors and that Williams did not enter the Citgo station.

### Use of a Handgun vs. Possession of a Handgun

 Consistent with the case law of this State, an individual must possess a handgun before he or she can use that handgun. For example, in *Harris v. State*, 331 Md. 137, 156–57, 626 A.2d 946, 956 (1993), in evaluating two different statutes, this Court stated that "use" requires "conduct different from possession—an active, rather than passive, employment of a handgun" and further, that " 'use' requires that the defendant 'carry out a purpose or action' or 'make instrumental to an end or process' or 'apply to advantage' the firearm" (quoting *Wynn v. State*, 313 Md. 533, 543, 546 A.2d 465, 470

(1988)).[11] Furthermore, in *Wynn*, we analyzed the language of Md. Ann.Code., Art. 27 § 36B (1957, Repl.Vol.1982, Cum. Supp.1986) [12] to determine whether the Legislature distinguished between the possession of a handgun and use of a handgun, when it enacted that provision. In that case, we examined whether mere possession of a handgun is equivalent to the use of a handgun under those provisions. In examining the preamble to Art. 27 § 36B, now codified as Md.Code (2002), § 4-202 of the Criminal Law Article (Legislative findings), we noted that

> the [L]egislature specifically distinguished between the *wearing, carrying and transporting* of handguns and the *use* of handguns in criminal activity ... [which] [ ] clearly indicates that the [L]egislature considered the use of a handgun to be something more than mere illegal possession of a handgun and that the [L]egislature contemplated *use* of a handgun in an active as opposed to a passive manner.

*Wynn*, 313 Md. at 541, 546 A.2d at 469. We stated further that, "the term 'use' connotes something more than bare possession of a handgun in the commission of a crime of

---

11. As we stated in *Harris*, 331 Md. at 148 n. 7, 626 A.2d at 951 n. 7: Other jurisdictions also define "use" as requiring more than possession of the firearm. *See Jordon v. State*, 274 Ark. 572, 626 S.W.2d 947, 950 (1982) ("Use of the verb 'employed' rather than 'in possession' compels us to conclude the Arkansas General Assembly intended something more than mere possession"); *People v. Funtanilla*, 1 Cal.App.4th 326, 331, 1 Cal.Rptr.2d 875, 877 (1991) (" '[U]se' means more than possession of a weapon or the bare potential for use...."); *People v. Hines*, 780 P.2d 556, 559 (Colo.1989) ("Use" is broad enough to include act of holding weapon in presence of another in manner that causes other person to fear for his safety); *Buschauer v. State*, 106 Nev. 890, 804 P.2d 1046, 1049 (1990) ("Use" of a weapon "in the commission of a crime"—indicates that the instrumentality must be used in conscious furtherance of a crime); *State v. Chouinard*, 93 N.M. 634, 603 P.2d 744, 745 (1979) ("Use" is different from "possession.").

12. This provision is now codified as, *inter alia*, two of the provisions at issue in this case—Md. Code (2002), § 4-203 of the Criminal Law Article (Wearing, carrying, or transporting handgun) and Md.Code (2002), § 4-204 of the Criminal Law Article (Use of handgun or antique firearm in commission of crime).

violence," and concluded that, therefore, the Legislature "did not equate carrying of a handgun with use of a handgun." [13] Although there exists a clear distinction between possession and use, possession is a necessary component of the term "use."

In accordance with these definitions and case law, we agree with Williams and the Court of Special Appeals, and conclude that Williams must have possessed the handgun before he could have used it. Because Williams embraced the entire criminal enterprise, it was inconsistent for the trial judge to conclude that Williams used the handgun, but did not actually or constructively possess that gun. The trial judge failed to adequately explain how Williams was not in possession of the handgun while traveling to the Citgo station with Henderson and Gaines, but, nonetheless, embraced all of the other crimes committed in furtherance of the attempted armed robbery.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. BALTIMORE COUNTY TO PAY THE COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**

---

**13.** In addition, the ordinary legal definitions of these terms support this proposition. The ordinary legal definition of "possession" is "[t]he fact of having or holding property in one's power; the exercise or dominion over property." BLACK'S LAW DICTIONARY 1201 (8th ed.1999). To the contrary, the ordinary legal definition of "use" is "[t]he application or employment of something; esp[ecially], *a long-continued possession and employment* of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." BLACK'S LAW DICTIONARY 1577 (8th ed.1999) (emphasis added).